UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DONNA KEMP, | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| | ) | No. 1:20-cv-00202-JMS-DML |
| *vs.* | ) | |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| *Defendant.* | ) | |

## **ORDER**

Plaintiff Donna Kemp was employed by the Indiana Department of Child Services ("DCS") as an accountant.  In April 2019, she was at work and was speaking with her daughter on the telephone.  During the call, Ms. Kemp reprimanded her daughter for using a racial slur against her, and repeated the racial slur while reprimanding her.  Several co-workers heard Ms. Kemp use the racial slur, complained, and Ms. Kemp was ultimately terminated.  Ms. Kemp then initiated this litigation against Defendant the State of Indiana ("the State"), alleging claims for race discrimination and retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), age discrimination and retaliation under the Age Discrimination in Employment Act, 29 U.S.C. § 621, et seq. ("ADEA"), and disability discrimination and retaliation under the Americans With Disabilities Act, 42 U.S.C. § 12181, et seq. ("ADA").  The State has now filed a Motion for Summary Judgment, [Filing No. 41], which is ripe for the Court's consideration.

## I.
### STANDARD OF REVIEW

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).  As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits.  Fed. R. Civ. P. 56(c)(1)(A).  A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact.  Fed. R. Civ. P. 56(c)(1)(B).  Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated.  Fed. R. Civ. P. 56(c)(4).  Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment.  Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision.  A disputed fact is material if it might affect the outcome of the suit under the governing law.  *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009).  In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative.  *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005).  Fact disputes that are irrelevant to the legal question will not be considered.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events.  *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003).  The moving party is entitled to summary judgment if no reasonable fact-finder could return a verdict for the non-moving party.  *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009).  The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor.  *Darst v. Interstate Brands Corp.*, 512 F.3d

903, 907 (7th Cir. 2008).  It cannot weigh evidence or make credibility determinations on summary

judgment because those tasks are left to the fact-finder.  *O'Leary v. Accretive Health, Inc.*, 657

F.3d 625, 630 (7th Cir. 2011).  The Court need only consider the cited materials, Fed. R. Civ. P.

56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that

they are not required to scour every inch of the record for evidence that is potentially relevant to

the summary judgment motion before them," *Johnson*, 325 F.3d at 898.  Any doubt as to the

existence of a genuine issue for trial is resolved against the moving party.  *Ponsetti v. GE Pension*

*Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### STATEMENT OF FACTS

The following factual background is set forth pursuant to the standard discussed above.

The facts stated are not necessarily objectively true, but as the summary judgment standard

requires, the undisputed facts and the disputed evidence are presented in the light most favorable

to "the party against whom the motion under consideration is made."  *Premcor USA, Inc. v.*

*American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A.      DCS's Code of Conduct

DCS has a Code of Conduct, which provides as follows:

> **Diversity and Non-Discrimination:**  DCS staff will be respectful, understanding
> of, and sensitive to the diverse cultural backgrounds of all individuals.   This
> includes but is not limited to, social diversity and oppression with respect to race,
> ethnicity, national origin, color, sex, sexual orientation, age, marital status, religion,
> and mental and physical disability.
>
> DCS staff will not condone or engage in any discrimination on the basis of race,
> ethnicity, national origin, color, gender, sexual orientation, age, marital status,
> political belief, religion, or mental or physical disability.   All reports of
> discrimination must be reported to DCS Human Resource or the State Personnel
> Department (SPD).

[Filing No. 43-7 at 6 (emphasis omitted).]

### B.      Ms. Kemp's Initial Employment With DCS

Ms. Kemp, who is white, was born in 1961.  [Filing No. 59-1 at 1.]  She has an adopted daughter, who was born in Guatemala and is of Hispanic origin.  [Filing No. 59-1 at 1.]  In 1991, Ms. Kemp became partially disabled when she lost four fingers on her left hand due to an automobile accident.  [Filing No. 59-1 at 1.]  As a result of the accident, she is substantially limited in reaching, lifting, grabbing, and interacting and communicating with others, and does not get out of the house as much as others to socialize.  [Filing No. 59-1 at 1.]

In July 1996, Ms. Kemp began working for the State of Indiana as an Account Clerk 4 in the Family and Social Services Administration ("FSSA").  [Filing No. 59-1 at 1.]  She was promoted to Clerical Assistant 4 in July 1998.  [Filing No. 59-1 at 1.]  In November 1998, she transferred to DCS and was promoted to Accountant 5 and then to Accountant 4 in 1999.  [Filing No. 59-1 at 1.]

### C.      Ms. Kemp's Discipline and Performance Reviews From 2000 to 2017

In 2000, Ms. Kemp was asked to train a new employee.  [Filing No. 59-1 at 1.]  During the training, she had to sit close to the new employee, and briefly touched the trainee's shoulder with her hand.  [Filing No. 59-1 at 1.]  Ms. Kemp's supervisor observed the incident, told the trainee that Ms. Kemp's conduct was sexual harassment, and told the trainee to report the incident to Human Resources ("HR").  [Filing No. 59-1 at 1.]  On November 29, 2000, Ms. Kemp received a letter of reprimand for inappropriate conduct in the workplace related to the incident, which mandated that she undergo sexual harassment and cultural diversity training.  [Filing No. 43-2.]

Ms. Kemp was promoted to Accountant 3 in January 2007.  [Filing No. 59-1 at 2.]  In a 2008 Employee Work Profile and Performance Appraisal Report, Ms. Kemp received ratings of "Does Not Meet" in five of the seven "competency categories," "Does Not Meet" in two of the six

"performance expectations/goals" categories, and an overall performance rating of "Needs Improvement." [Filing No. No. 43-1 at 3-9.] Also in 2008, Ms. Kemp received a "Work Improvement Plan-Notice of Substandard Performance" or "WIP." [Filing No. 43-9.] It stated that Ms. Kemp: (1) "has difficulty planning, prioritizing, and organizing the daily work-flow of her position"; (2) "does not take the personal initiative to work toward independence in performing responsibilities assigned to her"; (3) "sets aside problems and difficult scenarios for extended time periods before seeking assistance with or acting on steps to resolve them"; and (4) "struggles with expression of inappropriate comments in agency meetings and training sessions." [Filing No. 43-9 at 1.]

In her 2010 Employee Work Profile and Performance Appraisal Report, Ms. Kemp received four scores of "Does Not Meet" and an overall performance rating of "Needs Improvement." [Filing No. 43-10 at 1-9.] Due to the negative Work Profile and Performance Appraisal Report, another WIP was issued to Ms. Kemp which noted the following "specific performance deficiencies":

> 1) Employee has not demonstrated a "sense of ownership" in assuming the new task of handling P-Card transaction processing and reconciliation of these transactions with the monthly Chase Bank statement.
>
> 2) Employee has shown a lack of initiative in seeking information and generating pertinent inquiries relative to the knowledge she needs in order to handle the new P-Card reconciliation that has been assigned to her.
>
> 3) Employee has not met the level of independence that is appropriate for a PAT III level employee where P-Card Reconciliation is concerned.
>
> 4) Employee needs to become more aware of the current and future funding streams that are pertinent to her programs.

[Filing No. 43-11]

In her 2015 Employee Work Profile and Performance Appraisal Report, Ms. Kemp received an overall rating of "Meets Expectations," but received a "Does Not Meet" rating for

"communication." [Filing No. 43-3 at 3-9.] DCS noted that the volume, frequency, and duration of Ms. Kemp's personal communications were distracting to Ms. Kemp's co-workers and that Ms. Kemp should take steps to remediate the issue, such as controlling the level of her voice and conducting more lengthy personal conversations away from her desk and during breaks. [Filing No. 43-3 at 3.]

In her 2017 Employee Work Profile and Performance Appraisal Report, Ms. Kemp received a rating of "Does Not Meet Expectations" in the "teamwork" category, but received a score of "Meets" in the other categories. [Filing No. 43-12 at 3-9.] The review stated that Ms. Kemp demonstrated "an inconsistent attitude of personal adaptability" and a "negative approach" to projects. [Filing No. 43-12 at 3.]

**D.      DCS's Discipline of Other Employees**

Ms. Kemp relies on DCS's discipline of the following employees in support of her race and age discrimination claims:[1]

- Charrissa Antrobus, a Family Case Manager, is of mixed race and her age is unknown. In February 2018, she behaved unprofessionally at a staff meeting by turning the chair that she was sitting in away from everyone at the meeting and facing the wall. She remained facing the wall after her supervisor tapped her to signal her to turn around. She also sent a group text message to co-workers during the meeting with information from social media, and commented that she was bored. During the incident, Ms. Antrobus did not seem aware or concerned that her behavior signaled that she was not interested in the meeting and was disrespecting those at the meeting. On March 13, 2018, she was given a Written Reprimand for her actions at the meeting. In August 2018, she received "Does Not Meet" ratings for some areas and as an overall rating. In October 2018, a 30-day WIP was issued for problems she was having with case planning and communication. In November 2018, the WIP was extended for 30 days, and the WIP was terminated as unsuccessful in December 2018. Ms. Antrobus was terminated on December 13, 2018 for unsatisfactory performance. [Filing No. 59-4 at 3-24.]

---

[1] As discussed more fully below, Ms. Kemp does not provide information regarding whether any of the other DCS employees whose discipline histories she relies upon are disabled or not.

- Talena Barnard, a Clerical Assistant, is white and in her late 30s.  In 2018, she was spoken to numerous times regarding her unprofessional behavior, including "language and demeanor."  In March 2019, she twice displayed unprofessional behavior by using profanity when speaking to another staff member in a demeaning manner and by engaging in a personal telephone call during work hours in which she yelled and used profanity.  In March 2019, she was given a Written Reprimand.  [Filing No. 59-5 at 2-7.]

- Rachel Boone, a Family Case Manager, is African American and in her late 20s.  In August 2017, DCS received a complaint from the Goshen Police Department regarding Ms. Boone's behavior while discussing a case with school personnel.  In March 2018, Ms. Boone failed to go out on a visit related to a case to which she was assigned.  She was given counseling related to the incident.  Later in March 2018, Ms. Boone made inappropriate comments about a co-worker and, when the incident was addressed, she used an expletive and left the office for the day without approval.  She was given a Written Reprimand.  In July 2018, she received a "Does Not Meet" rating for "communication" and a "Needs Improvement" rating overall.  In February 2019, she was given a "Meets Expectation" rating for "communication" despite the Written Reprimand.  [Filing No. 59-6 at 2-25.]

- Bernard Pollard, a Family Case Manager, is African American and his age is unknown.  In August 2016, he was terminated for being unable to work in a satisfactory, dependable manner but was allowed to return to work at his supervisor's request.  In February 2018, a foster parent complained that Mr. Pollard was disrespectful and was loud and made sexist remarks.  The foster parents ended up leaving the DCS program.  Mr. Pollard was given counseling for the foster parent complaint.  Later in February 2018, Mr. Pollard was told not to have any personal communication while he was with clients and to use email for recommendations, updates, and questions from clients.  In September 2018, he received "Meets" ratings for all categories, including "communication."  In April 2019, he was terminated for unacceptable behavior.  [Filing No. 59-11 at 5-19.]

- Kathy Rodarte, a Stores Clerk who is Hispanic and in her mid-60s, was given counseling in December 2011 for being disrespectful to a co-worker.  In March 2018, a 60-day WIP was issued because Ms. Rodarte made inappropriate comments, was unprofessional, and behaved badly toward co-workers.  In January 2019, she received an "Exceeds" rating for "Job Knowledge" and "Meets" ratings for all other areas and overall.  In April 2019, she was given a one-day suspension for unacceptable actions.  [Filing No. 59-12 at 3-12.][2]

[2] Ms. Kemp provides the discipline history of additional DCS employees, but it is either apparent that those individuals do not fall outside of the classes within which Ms. Kemp falls for her race and age discrimination claims – *i.e.*, they are white and/or over 40 years of age – or their race and/or age are unknown.  These individuals include: (1) JoAnn Briles (race and age unknown),

### E.    Issues With Noise In Ms. Kemp's Workspace

The DCS work space where Ms. Kemp was stationed was arranged with a set of eight cubicles in the middle of the floor and offices on some of the perimeter walls.  [Filing No. 59-1 at 4.] Approximately two to three times per year, Ms. Kemp's supervisor, Juanita Sallee, would email the group she was supervising to remind them to keep their volume down so that others could concentrate on projects.  [Filing No. 59-1 at 3.]  Approximately twice per year, Ms. Sallee would talk to employees individually about having personal conversations.  [Filing No. 59-1 at 3.]  Ms. Kemp often stayed at her desk to have short personal conversations, so that she could continue to work, and she explained this to Ms. Sallee.  [Filing No. 59-1 at 3.] Ms. Kemp had a lot of personal telephone calls "during the periods when [her] daughter was becoming a teenager and [her] mother was battling dementia and Alzheimer's disease, and [Ms.] Sallee was aware of the care [Ms. Kemp] was giving [her] daughter and [her] mother."  [Filing No. 59-1 at 3.]  Whenever a co-worker complained that Ms. Kemp was speaking too loudly, she made an effort to speak more quietly. [Filing No. 59-1 at 4.]  Whenever a co-worker complained that Ms. Kemp's radio was too loud, she apologized and turned it down.  [Filing No. 59-1 at 4.]  Ms. Kemp complained to Ms. Sallee about another employee having a lot of personal telephone conversations at work.  [Filing No. 59-1 at 3.]

---

[Filing No. 59-7 at 2-12]; (2) Amanda Claycomb (white, over age 40), [Filing No. 59-8 at 2]; (3) Timothy Koponen (white, age unknown), [Filing No. 59-9 at 2-11]; (4) Benjamin Locke (white, age unknown), [Filing No. 59-10 at 2-3]; (5) Ashleigh Schalinske (white, age unknown), [Filing No. 59-13 at 3-11]; and (6) Kasey Schuerman (white, age unknown), [Filing No. 59-14 at 2-4]. Because these individuals cannot support Ms. Kemp's discrimination claims, the Court does not consider their discipline history.

**F.      The April 16, 2019 Incident and Ms. Kemp's Termination**

On April 16, 2019, Ms. Kemp and her daughter, a teenager at the time, were talking on the telephone while Ms. Kemp was at work, and Ms. Kemp's daughter called her a n***er.  [Filing No. 59-1 at 4.]  Ms. Kemp then told her daughter not to call her a n***er.  [Filing No. 59-1 at 4.] Ms. Kemp heard that an African-American co-worker, Ellen Small, laughed when she overheard the telephone conversation.  [Filing No. 59-1 at 4.]

No one complained to Ms. Kemp about her using the word n***er on the telephone call with her daughter.  [Filing No. 59-1 at 4.]  However, at least six co-workers submitted statements to DCS stating that they had overheard Ms. Kemp using the racial slur and expressing their concern.  [Filing No. 43-5.]  Those statements included the following:

- "Paul 'Chris' Fletcher['s] email stated:  This morning at approximately 8:45 am, Donna Kemp was having a personal telephone conversation.  During the course of the conversation, she used a racial explicative (sic) twice.  The explicative (sic) was '[N***er]' and '[N***a].'  These were both used in a voice above conversation level and likely heard by a number of individuals in the area."

- "Ellen Small['s] email stated:  I heard her say I'm not your N word to her daughter over the phone."

- "Julie Watson['s] email stated:  Sometime between 8:30 and 9:00 AM this morning, I overheard Donna Kemp talking on the telephone.  She screamed 'I am not your [N***er], [N***a], whatever your kids say these days!'  She said it very loudly as it turned out she was arguing with her daughter."

- "Faith Short[']s email stated:  This is to report that around 9am (I am unsure of the exact time) this morning, I heard a personal phone call take place between Donna Kemp and her Daughter.  Donna was getting upset with her daughter and began speaking loudly, during the call she stated to her daughter 'I am not your [n***er].'  She made this statement at least twice during the call and was speaking loud enough that there was no misunderstanding what was said."

- "Edith McGuire['s] email stated:  This morning around 8:45 I heard Donna say 'I'm not your [n***er]'!...or [n***a] or however you say it.'  It was my assumption she was speaking to her daughter and her daughter referred to her as '[n***a]' on the other end of the line but I cannot verify that.  What I can say is that it made me very uncomfortable and upset.  Talking on the phone is one

thing, talking on the phone loudly is another and talking on the phone loudly and offensively is yet another.  I do not think Donna was referring to anyone in this office or even any person and I don't think that she at all intended to be offensive, simply put I believe she just doesn't have any couth."

- "Pamela Wattley['s] email stated:  Approximately 1 hour ago I was talking to a Coworker when I overheard Donna Kemp say 'I ain't no [N***a]' during the course of a telephone conversation."

[Filing No. 43-5 at 1-2.]

An HR employee asked Ms. Kemp if she had said the word "n***er," and Ms. Kemp said that she did tell her daughter not to call her that word.  [Filing No. 59-1 at 5.]  The Investigation Report relating to the April 16, 2019 telephone call states:

**SUMMARY OF ALLEGATIONS:**
Chief Financial Officer Leah Raider…sent HR an email regarding a concern Raider and Joseph Fistrovich…had about Donna Kemp…using a racial explicative (sic) in reference to the N word in the workplace while on a personal phone conversation. At the time of the email, Fistrovich had already compiled six (6) witness statements from employees and contractors who had overheard the phone conversation and went to Fistrovich with their concerns.

**SUMMARY OF RESPONSE:**
[Ms.] Kemp admitted to using the words "[N***er]" and "[N***a]" in a personal phone conversation while in the workplace because "there's nowhere else to go." [Ms.] Kemp stated she was directing the caller to not call her those names and would never use those names to describe someone else or when speaking with anyone.

*          *          *

**CONCLUSION AND RECOMMENDATION:**
Based on the information obtained during the investigation, [Ms.] Kemp admitted to using a racial explicative (sic) while at her workstation.  Information obtained during the investigation support[s] [Ms.] Kemp's behavior does not meet DCS's expectation of their staff as evidence by her admission.  Therefore, [the Personnel Department] recommends dismissal for [Ms.] Kemp.

[Filing No. 43-5 at 1-2.]

On April 18, 2019, Ms. Kemp was terminated for engaging in inappropriate conduct in the workplace and for violating the DCS Code of Conduct.  [Filing No. 43-6.]

### G.     Ms. Kemp's Appeal of Her Termination

Ms. Kemp filed an appeal of her termination with the State Employees' Appeals Commission, alleging that her termination was a result of age, race, and disability discrimination and retaliation, in violation of Title VII.  [Filing No. 43-8 at 2-3.]  The Commission granted DCS's Motion for Summary Judgment on all of Ms. Kemp's claims.  [Filing No. 43-8.]

### H.     Equal Employment Opportunity Commission Charge

Ms. Kemp filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on September 24, 2019.  [Filing No. 26 at 5-6; Filing No. 27 at 4.]  The EEOC mailed Ms. Kemp a Right to Sue Letter on October 24, 2019.  [Filing No. 26 at 26; Filing No. 27 at 4.]

### I.     The Lawsuit

Ms. Kemp initiated this lawsuit on January 17, 2020, [Filing No. 1], and filed the operative Amended Complaint on July 2, 2020, [Filing No. 26].  In the Amended Complaint, Ms. Kemp sets forth claims for race discrimination and retaliation under Title VII, age discrimination and retaliation under the ADEA, and disability discrimination and retaliation under the ADA.  [Filing No. 26 at 6-8.]  The State has moved for summary judgment on all of Ms. Kemp's claims.  [Filing No. 41.]

### III.
#### DISCUSSION

### A.     Race Discrimination Claim Under Title VII

In support of its Motion for Summary Judgment, the State argues that, because Ms. Kemp is white, she is asserting a reverse discrimination claim and must show that there was something "fishy" or "racially invidious" about her termination.  [Filing No. 42 at 7.]  It argues further that Ms. Kemp has not set forth a prima facie case of race discrimination because she was not

11

performing well enough to meet DCS's legitimate expectations, and she has not identified any similarly situated employees outside of her class who were treated more favorably. [Filing No. 42 at 8.]   Finally, the State asserts that DCS had a legitimate, non-discriminatory reason for terminating Ms. Kemp, because she "used a derogatory racial slur at least once during a personal conversation, while at work, at a volume loud enough for at least six other employees to hear." [Filing No. 42 at 9.]

In response, Ms. Kemp argues that "[w]hen the white Plaintiff was called a [n***er], [DCS] did not allow her to oppose such action by her Hispanic Native American daughter," but instead terminated Ms. Kemp for "oppos[ing] the discrimination." [Filing No. 60 at 34.]   She asserts that DCS treated her worse than other employees who DCS says engaged in similar behavior and who were of different races and "who did not oppose discrimination." [Filing No. 60 at 34.]   Ms. Kemp states that DCS did not follow its own policies, and did not tell Ms. Kemp "what she should have done." [Filing No. 60 at 34.]   Ms. Kemp contends that DCS "did not terminate any of the other employees who opposed the use of the word," but "only terminated [Ms. Kemp] when she opposed the word against her own self." [Filing No. 60 at 34.]   She argues that DCS did not have a policy or offer any training "on how someone should oppose a racial name," and that "[i]f [DCS] wants employees to describe the word some other way, [DCS] must instruct its employees how to oppose the use of the word before terminating someone for opposing the use of the word." [Filing No. 60 at 35.]

In its reply, the State argues that Ms. Kemp did not address the standard for a reverse discrimination claim in her response.   [Filing No. 63 at 2.]   It notes Ms. Kemp's argument that DCS did not tell her how she should have handled the phone call from her daughter, and states that "[a]ny American living in 2021 knows that it is racially insensitive and wildly inappropriate to

shout a racial slur in the workplace." [Filing No. 63 at 2.] The State asserts that the other employee Ms. Kemp points to who used the same racial slur and was suspended rather than terminated has not been identified by race, so it is unknown whether the employee is a different race than Ms. Kemp and it is unlikely that they have "identical conduct histories." [Filing No. 63 at 3.] Finally, the State argues that Ms. Kemp attempts to blame her behavior on her disability and the fact that her daughter is of Hispanic Native American origin, which "is ridiculous." [Filing No. 63 at 4.][3]

Title VII forbids an employer from discriminating against any individual with respect to his or her "compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). "[T]he singular question that matters in a discrimination case [is]: '[W]hether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the…adverse employment action,'" Johnson v. Advocate Health & Hosps. Corp., 892 F.3d 887, 894 (7th Cir. 2018) (quoting Ortiz v. Werner Enterprises, Inc., 834 F.3d 760, 765 (7th Cir. 2016)), and a plaintiff must provide such evidence in order to survive summary judgment, Milligan-Grimstad v. Stanley, 877 F.3d 705, 710 (7th Cir. 2017).

A plaintiff may rely on both direct and circumstantial evidence to support an inference of causation and intent. Joll v. Valparaiso Comm. Schs., 953 F.3d 923, 929 (7th Cir. 2020). A

---

[3] Ms. Kemp also filed a surreply, in which she addresses the State's contention that some of her evidence is "her own subjective speculation," but mostly replies to "new arguments" she claims the State set forth in its reply brief, and reiterates the arguments she made in her response brief. [See Filing No. 64.] Local Rule 56-1(d) provides that "[a] party opposing a summary judgment motion may file a surreply brief only if the movant cites new evidence in the reply or objects to the admissibility of the evidence cited in the response. The surreply…must be limited to the new evidence and objections." Based on Local Rule 56-1(d), the Court will only consider the portions of Ms. Kemp's surreply which address the State's objections to her evidence. But in any event, the Court has considered all of Ms. Kemp's evidence, including any evidence that the State has categorized as "subjective speculation," and it does not change the outcome of the case.

plaintiff can also "enlist the burden-shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792 (1973)]" "[t]o clarify and to simplify her task." *Joll*, 953 F.3d at 929 (quotation and citation omitted).  The Court's focus is to "consider[ ] [the evidence] as a whole, rather than asking whether any particular piece of evidence proves the case by itself – or whether just the 'direct' evidence does so, or the 'indirect' evidence." *Golla v. Office of Chief Judge of Cook Cnty., Ill.*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).  In determining whether the evidence would permit a factfinder to conclude that Ms. Kemp's race caused her to be treated unfairly, "the burden-shifting framework of *McDonnell Douglas* remains relevant as a means of organizing, presenting, and assessing circumstantial evidence in frequently recurring factual patterns found in discrimination cases." *Owens v. Old Wis. Sausage Co., Inc.*, 870 F.3d 662, 667 (7th Cir. 2017) (quotation and citation omitted).  But the Court "review[s] the evidence holistically to see if it permits an inference of race discrimination." *Lloyd v. Mayor of City of Peru*, 761 Fed. App'x 608, 610 (7th Cir. 2019).  "[A]ll evidence belongs in a single pile and must be evaluated as a whole." *Igasaki v. Ill. Dept. of Fin. & Prof. Reg.*, 988 F.3d 948, 957 (7th Cir. 2021) (citation and quotation omitted).

Under the *McDonnell Douglas* framework, a plaintiff must "make a prima facie case of discrimination, at which point the burden shifts to the employer to offer a nondiscriminatory motive, and, if the employer does so, the burden shifts back to the plaintiff to show that the employer's stated reason was a pretext.*" Purtue v. Wis. Dep't of Corr.*, 963 F.3d 598, 601-02 (7th Cir. 2020).  To make a prima facie case under *McDonnell Douglas*, a plaintiff must show: (1) she belongs to a protected class; (2) she met her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) another similarly situated employee outside of her protected class received better treatment from her employer.  *Marshall v. Ind. Dep't of Corr.*, 973

F.3d 789, 791-92 (7th Cir. 2020).  When the plaintiff asserts a reverse race discrimination claim, as Ms. Kemp does here, the requirements for a prima facie case are slightly different and the plaintiff must show that: "(1) background circumstances exist to show an inference that the employer has reason or inclination to discriminate invidiously against whites or evidence that there is something 'fishy' about the facts at hand; (2) [she] was meeting [her] employer's legitimate performance expectations; (3) [she] suffered an adverse employment action; and (4) [she] was treated less favorably than similarly situated individuals who are not members of [her] protected class." *Formella v. Brennan*, 817 F.3d 503, 511 (7th Cir. 2016) (citation and quotation omitted).

Ms. Kemp's reverse race discrimination claim fails on several fronts.  First, Ms. Kemp has not pointed to any evidence of circumstances which lead to an inference that DCS had reason, or was inclined, to engage in invidious discrimination against white individuals, or that there was something "fishy" about her termination.  A plaintiff can satisfy this first requirement of a prima facie case in the reverse discrimination context by showing "that members of one race were fired and replaced by members of another race," or  "that employers are under pressure from affirmative action plans, customers, public opinion, the EEOC, a judicial decree, or corporate superiors imbued with belief in diversity." *Bless v. Cook Cnty. Sheriff's Office*, --- F.4th ----, 2021 WL 3626817, at *5 (7th Cir. 2021) (quotations and citations omitted).  Ms. Kemp's response is somewhat jumbled, and she appears to argue that it was unfair that she faced consequences for using the word "n***er" when complaining to her daughter about her daughter using the word, but that employees who then used the word when complaining about Ms. Kemp's behavior did not face the same consequences.  This argument is convoluted, and ignores the fact that the employees who complained of Ms. Kemp's behavior did so privately to HR, and not loudly in the workplace for others to hear, as Ms. Kemp did.  Additionally, the Court rejects Ms. Kemp's position that DCS

should have trained Ms. Kemp regarding how to handle the situation she faced during the personal telephone call with her daughter, or instructed her regarding a different word to use instead. DCS has no such duty, nor could it have foreseen the situation that occurred. Ms. Kemp has not pointed to circumstances suggesting that DCS had a "reason or inclination to discriminate invidiously against whites," or that there was anything "fishy" about DCS's decision to terminate her. *Formella*, 817 F.3d at 511.

Second, Ms. Kemp has not shown that she was meeting DCS's legitimate employment expectations. She had been reprimanded multiple times for inappropriate conduct, she had received "Does Not Meet" ratings in several areas and over the course of several years, and she used a racial slur in the workplace, in direct violation of the DCS Code of Conduct.

Third, Ms. Kemp has now shown that she was treated less favorably than her non-white peers. Ms. Kemp needs to show "that [she] was 'singled out for worse treatment' than similarly situated employees." *Seymour-Reed v. Forest Preserve Dist. of DuPage Cnty.*, 2018 WL 4944826, at *2 (7th Cir. 2018) (quoting *Crawford v. Ind. Harbor Belt R.R.*, 461 F.3d 844, 846 (7th Cir. 2006)). "[A]n employee is similarly situated to a plaintiff if the two employees deal with the same supervisor, are subject to the same standards, and have engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their employer's treatment of them." *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (citations and quotations omitted). "[I]n order to show that a coworker is similarly situated to a terminated employee, the employee must show that the other coworker had a 'comparable set of failings.'" *Abrego v. Wilkie*, 2018 WL 5603034, at *4 (7th Cir. 2018) (quotations and citations omitted). The only comparators to whom Ms. Kemp points that are not white – Ms. Antrobus, Ms. Boone, Mr. Pollard, and Ms. Rodarte – are not similarly situated to Ms. Kemp. First and foremost, none were disciplined for

16

using a racial slur in the workplace.  Second, there is no indication that those individuals had the same supervisor as Ms. Kemp.  Further, those individuals' discipline histories are different than Ms. Kemp's discipline history and, viewing the evidence in the light most favorable to Ms. Kemp, she has not shown that those individuals had a "comparable set of failings" such that they were similarly situated.  *See Abrego*, 2018 WL 5603034, at *4.

Finally, even if Ms. Kemp had set forth a prima facie case of reverse race discrimination, she must then present evidence that the reasons DCS offers for terminating her are pretextual.  The only evidence provided in this case indicates that DCS terminated Ms. Kemp for using the word n\*\*\*er in the workplace, where multiple co-workers could hear her, after already having been disciplined for other inappropriate conduct.  This Court "does not act as a superpersonnel department." *Milligan-Grimstad*, 877 F.3d at 710 (internal quotation omitted).  Instead, it looks only to whether DCS's explanation for terminating Ms. Kemp is supported by legitimate reasons, not whether terminating her was the best decision.  *See David v. Bd. of Trustees of Comm. Coll. Dist. No. 508*, 846 F.3d 216, 229 (7th Cir. 2017) ("Our role…is not to inquire into the wisdom of an employment decision, but simply to determine if the employer is dissembling to cover up a discriminatory purpose"); *Coleman v. Donahoe*, 667 F.3d 835, 852 (7th Cir. 2012) ("[T]he only question is whether the employer's proffered reason [for the adverse employment action] was pretextual, meaning that it was a lie") (quotation and citation omitted); *Ptasznik v. St. Joseph Hosp.*, 464 F.3d 691, 697 (7th Cir. 2006) ("[I]t is not our role to determine the competency of or interfere in employment decisions simply where we believe an employer has made a poor choice. Federal courts have authority to correct an adverse employment action only where the employer's decision is unlawful, and not merely when the adverse action is unwise or even unfair").  There is simply no evidence that DCS terminated Ms. Kemp because she is white.

The Court **GRANTS** the State's Motion for Summary Judgment on Ms. Kemp's race discrimination claim.

### B.       Age Discrimination Claim Under the ADEA

In support of its Motion for Summary Judgment, the State argues that Ms. Kemp has not set forth a prima facie case of age discrimination because she has not shown that she was meeting DCS's legitimate expectations or that DCS treated similarly situated individuals who were under 40 years of age more favorably than it treated her.  [Filing No. 42 at 9-10.]  It also argues that even if she had set forth a prima facie case of age discrimination, "DCS had a legitimate, non-discriminatory reason for dismissing [Ms.] Kemp, entirely independent of her age, or any class status," which was that she used a derogatory racial slur.  [Filing No. 42 at 10.]

In her response, Ms. Kemp argues that she was meeting DCS's legitimate expectations, stating that "[w]hen the offered reason for the argument of failure to meet expectations is the same as the offered reason for the adverse action, the courts go directly to the reason for the adverse action," and that "[t]he offered reason for the argument of failure to meet expectations and the same offered reason for the adverse action is not a legitimate non-discriminatory reason." [Filing No. 60 at 33.]  Ms. Kemp argues further that the State "allowed [Ms. Kemp's] daughter, who was nineteen years of age, to call [Ms. Kemp], who is far over forty years of age, a [n***er], [and so] treated the younger person much more favorably than it treated the much older employee." [Filing No. 60 at 32.]  She contends that "[t]he State's position that is can allow non-employees to call their employees racial names is further evidence of the discrimination and retaliation that the State allows against its employees.…  If the State wanted [Ms. Kemp] or her daughter to use another word, the State could have told [Ms. Kemp] not to use 'that word' and/or told her daughter not to use 'that word.'" [Filing No. 60 at 33.]

18

In its reply, the State reiterates its arguments and notes that Ms. Kemp has not provided or discussed the ages of the comparators she has set forth.  [Filing No. 63 at 4.]

The ADEA makes it unlawful for employers to discriminate against employees who are 40 years old or older because of their age.  29 U.S.C. § 623.  To prove her claim, Ms. Kemp must show that her age "was the 'but-for' cause of the challenged [adverse employment] action." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 454 (7th Cir. 2018) (citing *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177-78 (2009)).  "[U]nder the ADEA, it's not enough to show that age was a motivating factor," but rather a plaintiff "must prove that, but for [her] age, the adverse action would not have occurred."  *Id.* (quotations, citations, and emphasis omitted).  The same framework used for evaluating Title VII claims, and set forth above, is also used for evaluating discrimination claims under the ADEA.  *David*, 846 F.3d at 224-25.

As with her Title VII race discrimination claim, Ms. Kemp fails to set forth a prima facie case of discrimination under the ADEA.  First, as discussed above, she has not shown that she was meeting DCS's legitimate expectations.  Second, even if Ms. Kemp was meeting DCS's legitimate expectations, she does not point to comparators who were similarly situated to her, under the age of forty, and treated more favorably than she was treated.  Ms. Kemp makes no attempt to identify which comparators she has set forth to support her ADEA claim, or to show why they were similarly situated.  The only comparators the Court can identify as potentially supporting Ms. Kemp's ADEA discrimination claim are Ms. Barnard (in her late 30s) and Ms. Boone (in her late 20s).  [Filing No. 59-5 at 2; Filing No. 59-6 at 3.]  But Ms. Kemp has not shown that they had the same supervisor as her, neither of those individuals is alleged to have used a racial slur in the workplace, and they both have different discipline histories than Ms. Kemp.  Additionally, Ms. Kemp's reliance on her daughter as a comparator reflects a fundamental misunderstanding of the

applicable law and borders on nonsensical.  DCS has no duty with respect to Ms. Kemp's relationship with her daughter.  Ms. Kemp must show that DCS treated another employee who was under the age of forty more favorably than her – not a non-employee, over whom DCS has no control.

In any event, even if Ms. Kemp had set forth a prima facie case of age discrimination under the ADEA, she has not produced any evidence of pretext – indeed, she has not even attempted to do so.  [*See* Filing No. 60 at 32-33 (Ms. Kemp omitting any discussion of pretext in her discussion of her ADEA discrimination claim).]  There is no evidence that DCS's decision to terminate Ms. Kemp was actually motivated by Ms. Kemp's age, rather than by the fact that she used an offensive racial slur in the workplace.

The Court **GRANTS** the State's Motion for Summary Judgment on Ms. Kemp's ADEA discrimination claim.

### C.    Disability Discrimination Claim Under the ADA

The State argues in support of its Motion for Summary Judgment that Ms. Kemp has not set forth a prima facie case of disability discrimination because she has not shown that she was meeting DCS's legitimate expectations and she cannot show that she suffered an adverse employment action because of her disability.  [Filing No. 42 at 11.]  It notes that Ms. Kemp "cannot show why, after a long career with DCS, her physical disability suddenly motivated DCS to terminate her employment on April 18, 2019."  [Filing No. 42 at 11.]

In response, Ms. Kemp argues that DCS points to "a few negative statements about [her] over a period of 11 years, but…ignores the positive statements about her."  [Filing No. 60 at 31.] Ms. Kemp also contends that "[DCS] does not dispute that [she] requested an instruction, training, or a lesser discipline than termination, and [DCS] failed to engage in an interactive process to

study an appropriate accommodation for [her] disability." [Filing No. 60 at 31.] Ms. Kemp asserts that "[DCS] calling [her] opposition to a racial word the use of a racial word is not really her using a racial word," and that the DCS Code of Conduct's provision on cultural diversity "does not legitimately apply to terminate [her] when she was opposing the use of a racial word, not herself using a racial word." [Filing No. 60 at 31-32.] Ms. Kemp points to the employees who complained of her use of the word n***er, and argues that they were not also terminated for using that word when complaining about her. [Filing No. 60 at 32.]

In its reply, the State acknowledges that another DCS employee, JoAnn Briles, used the word n***er at work when telling a story about a child who had used the word during a home visit, and whose parents had instructed the child to use a different word instead. [Filing No. 63 at 5 (discussing Filing No. 59-7 at 2-4).] The State notes, however, that Ms. Briles was suspended for three days for the incident. [Filing No. 63 at 5.] Finally, the State argues that the co-workers who complained about Ms. Kemp using the word n***er "were reaching out to a work superior, privately, about a situation that made them feel uncomfortable," which is different than saying the word "in the middle of the workplace," as Ms. Kemp did. [Filing No. 63 at 5.]

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A claim for disparate treatment under the ADA requires proof that: "(1) the plaintiff was disabled; (2) the plaintiff was otherwise qualified to perform essential functions with or without reasonable accommodation; and (3) disability was the 'but for' cause of the adverse employment action." *Castetter v. Dolgencorp, LLC*, 953 F.3d 994, 996 (7th

Cir. 2020).  Like an ADEA claim, a discrimination claim under the ADA is also analyzed under the Title VII framework set forth above.

Any claim by Ms. Kemp that DCS treated her differently because of her disability fails as a matter of law.  She has not shown that her disability was the "but for" cause of her termination and, even if she had, she has not provided any evidence of pretext.  There is simply no evidence at all that DCS's decision to terminate Ms. Kemp for using a racial slur was really pretext for terminating her due to her disability.

Ms. Kemp appears to base her disability claim on the argument that she has a limited ability to interact socially and to communicate due to missing four fingers, and that DCS discriminated against her by failing to try to accommodate her disability by providing "advice, training, or discipline less than termination." [Filing No. 60 at 1.]  But to the extent Ms. Kemp is also asserting a failure-to-accommodate claim under the ADA, such a claim would fail as well.  "A claim for failure to accommodate under the ADA…requires proof [that:] (1) plaintiff was a qualified individual with a disability; (2) defendant was aware of [her] disability; and (3) defendant failed to accommodate [her] disability reasonably." *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019).  Ms. Kemp claims that her disability caused her to be lacking in social interaction and communication skills, but she has not provided any evidence that DCS was aware of those shortcomings,[4] or that she requested any type of accommodation for those shortcomings.

Even assuming Ms. Kemp could set forth a prima facie case of discrimination based on her disability, she has not presented evidence from which a reasonable jury could conclude that DCS's

---

[4] While the Court does not question whether Ms. Kemp's disability caused her to have a limited ability to interact socially or to communicate, it also finds that this consequence of her disability did not impose on DCS some sort of duty to provide enhanced training or instruction to avoid using a racial slur in the workplace.

decision to terminate her was a pretext for disability discrimination, or that DCS somehow failed to accommodate her disability.  Accordingly, the Court **GRANTS** the State's Motion for Summary Judgment on Ms. Kemp's disability discrimination claim under the ADA.[5]

### D.    Retaliation Claim Under Title VII, the ADEA, and the ADA

In support of its Motion for Summary Judgment, the State argues that Ms. Kemp has not shown that her termination "would not have taken place 'but for' the completion of a protected activity."  [Filing No. 42 at 12.]  It also asserts that it is not clear what protected activity Ms. Kemp claims she engaged in, or what retaliation laws or policies she contends DCS violated.  [Filing No. 42 at 12.]

Ms. Kemp responds that she engaged in protected activity when she reprimanded her daughter for calling her a derogatory name.  [Filing No. 60 at 25.]  She asserts that there was a direct causal connection between her engaging in the protected activity – *i.e.*, telling her daughter not to call her a n***er – and her termination.  [Filing No. 60 at 25.]

In its reply, the State argues that "[s]houting [n***er] in a workplace is not a form [of] protected speech or…a necessary aspect of defending oneself from racial discrimination," and so Ms. Kemp's retaliation claim fails.  [Filing No. 63 at 6.]

---

[5] The Court notes that Ms. Kemp alleges in her Amended Complaint that after her termination, she "applied for approximately twenty-five job positions with [the State], she only received two interviews, and [the State] failed to hire her for any position, even though she was more qualified than other applicants."  [Filing No. 26 at 5.]  While Ms. Kemp mentions the State's failure to rehire her in her Statement of Claims, [Filing No. 32 at 1], she does not mention the failure to rehire her in her response brief, [Filing No. 60], or her surreply, [Filing No. 64].  In any event, a discrimination or retaliation claim based on the State's failure to rehire her after her termination would fail as a matter of law, because Ms. Kemp has not presented any evidence related to the failure to rehire, including what positions she applied for, and how her race, age, or disability factored into the State's decision not to rehire her.  To the extent Ms. Kemp intended to rely on a failure-to-rehire theory in support of her discrimination and retaliation claims, the Court finds that she has abandoned that theory.

At the outset, the Court finds that to the extent Ms. Kemp brings her retaliation claim under the ADEA and the ADA, [*see* Filing No. 26 at 8 (mentioning the ADEA, the ADA, and Title VII in the section of the Amended Complaint setting forth her retaliation claim)], the claim fails as a matter of law.  The only protected activity which Ms. Kemp relies upon for her retaliation claim is complaining about racial discrimination by telling her daughter not to use the word n\*\*\*er.

To survive summary judgment on her retaliation claim under Title VII, Ms. Kemp must present evidence that she "'suffered a materially adverse action because [she] engaged in protected activity.'" *Lloyd*, 761 Fed. App'x at 611-12 (quoting *Shott v. Katz*, 829 F.3d 494, 497 (7th Cir. 2016)).  A plaintiff engages in protected activity by, among other things, "opposing an unlawful employment practice." *Northington v. H & M Int'l*, 712 F.3d 1062, 1065 (7th Cir. 2013).  The Seventh Circuit has explained that "a report of discrimination to a supervisor may be statutorily protected activity" if it includes a complaint of discrimination based on a protected characteristic "or sufficient facts to raise that inference," *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008), but "[v]ague and obscure complaints do not constitute protected activity," *Northington*, 712 F.3d at 1065 (quotation and citation omitted).  The ultimate question is "whether the evidence produced would permit a reasonable factfinder to conclude [Ms. Kemp's race] caused the discharge." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 885 (7th Cir. 2018).

In the typical Title VII retaliation case, an employee complains to a supervisor that a co-worker discriminated against them based on race or files an EEOC Charge, and then faces an adverse employment action.  Here, Ms. Kemp asserts that telling her daughter not to call her a n\*\*\*er during a personal phone call while at work is a protected activity.  But the Court is not aware of, and Ms. Kemp has not pointed to, any legal precedent standing for the proposition that complaining to a family member on the telephone while at work about the family member using a

24

racial slur is a protected activity within the context of a Title VII retaliation claim.  In any event, even if Ms. Kemp did engage in a protected activity, the evidence shows that she was fired for using the same racial slur out loud in the workplace, where her co-workers could hear.  Ms. Kemp's use of the racial slur, and not the fact that Ms. Kemp complained of her daughter's use of the word, is what caused her termination.  *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1011 (7th Cir. 2000) ("Employees may not immunize improper behavior simply by [complaining about discrimination].  Employers retain, as they always have, the right to discipline or terminate employees for any legitimate, nondiscriminatory reason") (citing *Glover v. South Carolina Law Enforcement Div.*, 170 F.3d 411, 414 (7th Cir. 1999)).  Again, the Court rejects the notion suggested by Ms. Kemp that DCS was somehow obligated to train her to not use the word n***er, or to instruct her regarding a different word to use in its place while she was on a personal phone call in the workplace.  No such obligation existed, and the Court finds merit in the State's assertion that it is common knowledge – and was common knowledge in 2019, when this incident occurred – that the word n***er is extremely offensive and should not be used, no matter the circumstances.

Ms. Kemp has not set forth any protected activity that she engaged in under the ADEA or the ADA.  Further, she has not shown that repeating a racial slur while disciplining her daughter is a protected activity under Title VII, or that the act of disciplining her daughter caused her termination.  The Court **GRANTS** the State's Motion for Summary Judgment on Ms. Kemp's retaliation claim, to the extent it is brought under Title VII, the ADEA, or the ADA.

### IV.
#### CONCLUSION

"Simply being a member of a protected class, without something more to link that status to the action in question, is not enough to raise a reasonable inference of discriminatory animus." *Cole v. Bd. of Trs. of N. Ill. Univ.*, 838 F.3d 888, 900 (7th Cir. 2016).  Among other deficiencies

with her claims, Ms. Kemp has failed to set forth any evidence from which a reasonable jury could conclude that her race, age, or disability played any role in DCS's decision to terminate her for using a racial slur in the workplace, or that DCS discriminated against her based on her protected characteristics.  Accordingly, for the foregoing reasons, the Court **GRANTS** the State's Motion for Summary Judgment, [41].  Final judgment shall enter accordingly.

Date: 8/20/2021

Hon. Jane Magnus-Stinson, Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**

26